# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL MALCOM,<br><br>Defendant. | No. CR11-3057-MWB-1<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

On December 16, 2011, the defendant was indicted on charges of sexual exploitation of children, conspiracy to sexually exploit children, and interstate transportation of a minor with intent to engage in criminal sexual activity, in violation of 18 U.S.C. §§ 2, 2421, 2251(a), 2251(e), and 2423(a). Doc. No. 4. On April 30, 2012, the defendant filed the present motion to suppress. Doc. No. 64. The government filed a resistance (Doc. No. 74), to which the defendant replied (Doc. No. 75). On May 9, 2012, the court held a hearing on the motion. The matter is now fully submitted.

*Background*

On September 17, 2010, Webster County Deputy Sheriff Jason Bahr applied for and obtained a warrant to search the defendant Michael Malcom's residence and his business, Humboldt Ag Supply. Doc. No. 64-2 ("Def.'s Ex. A"). In his affidavit in support of his search warrant application, Deputy Bahr stated the following:

> On Wednesday, September 15, 2010 I was contacted by Fort Dodge Police Officer, Matt Lundberg, in regards to wanting assistance with a possible child exploitation case and asked that I speak with the victim. I was at that time introduced to Paula [Redacted] and her 17 year old daughter [D.] Paula explained that on Friday, September 10, 2010 she was driving into her apartment complex parking lot where she now lives in Huxley, Iowa when a white truck pulled up behind her. She got out of her vehicle and spoke

with the driver who she described as a professional looking middle aged man. She stated the male asked her if she knew which apartment a girl by the name of [D.] lived in. Paula asked him why and he stated that he was coming to visit her. She asked this male who he was and he stated he was [D.'s] uncle to which she stated that she was her mother and that she did not know him. He then explained that he really wasn't and when Paula asked him what a middle aged man was doing looking for a 17 year old girl he drove away. She stated that she questioned [D.] about this man and [D.] ended up telling her that a mutual family friend by the name of [N.] had arranged with this man to take naked pictures of her and that [N.] gave her some of the money he paid. Paula stated that [the] daughter said this occurred more than once. Officer Lundberg completed a report.

I then spoke with [D.] who stated she is a 17 year old female with a date of birth of [redacted]. She explained that she used to live in Fort Dodge when she was little but had moved to Oklahoma. She explained that [N.] was a mutual friend of both her mom and her and that when they moved back to Fort Dodge, they moved in with [N.] at [redacted] in Fort Dodge, Iowa. She explained that [N.] did not work and that she had an older male who she said he was a "trick that got her pregnant," and who now gives her $700 a week. She stated that [N.] has two children. She also said that [N.] told her about how she "turned tricks" or prostituted for money. [D.] also stated that she believed that [N.] sold marijuana and that she saw marijuana in the house numerous times. [D.] said that [N.] asked her if she wanted to make some money, and explained that all she had to do was let a guy take pictures of her naked. [D.] said she went with [N.] to a motel in Fort Dodge where they met an older male subject in his room who gave her lingerie to wear and he then took pictures of her with a digital camera. She explained that he did have her take the lingerie off and pose naked while he photographed her. She explained that [N.] stayed in the room with her while this took place. She stated that the guy paid [N.] $500 and that [N.] gave her $250. [D.] stated that she believed this occurred in late June 2010 and that she was 16 years of age at the time. She stated that [N.] took her another time to the same motel and she met with the same older male but this time [N.] did not stay with her. She stated she was again asked to put on lingerie and eventually strip while the older male took pictures of her naked. She stated though that the older male then asked her to masturbate while he videotaped her which she said she did because he pushed her to do it. She stated that the older male also masturbated while filming her. [D.] also

2

stated that the older male then also asked her to perform oral sex on him but she refused. She said that [N.] returned to the hotel room at which time the older male paid [N.] and [N.] again gave her $250. [D.] stated this occurred once more at the same hotel with the same older male which she again was asked to wear lingerie, was photographed naked, and did masturbate while being videotaped. She also stated that this adult male then gave her a ride back to [N.'s] apartment where he again paid [N.] and then [N.] paid her. I asked [D.] to describe the lingerie that the older male asked her to wear and she stated it was a black bra, black thong panties with stringed hips, and a red 1 piece teddy. I asked [D.] to describe the camera and video camera that this older male used to take pictures and video of her. She stated the camera was a digital camera with the screen on the back and was black in color. She described the video camera as silver with a flip out screen. I asked [D.] to describe the adult male who she met at the hotel each time. She stated he was an older male with graying hair and was always dressed nice. She stated [N.] called him either Mike or Humboldt and that he drove a full size white truck and she knew his number to be 515-[redacted]. She also explained that this older male did tell her that he was married and that he owned a business. She also asked the older male what he was going to do with the pictures he took of her and he explained to her that he would add them to his collection. She had asked him if he had other girls he photographed and he stated that yes he photographed a [V.] and [A.] He told her he liked younger girls and asked her if she knew any other girls that she could bring that were younger than her. [D.] stated that all three of these visits to the hotel occurred in the months of June, July and early August although she did not have specific dates. She did explain that they always occurred in the middle of the afternoon. [D.] was unable to tell me what the name of the hotel was that she was taken to but told me that she would remember the hotel when she saw it and knew it was out by Menards in Fort Dodge. At that time I drove [D.] to numerous hotels in Fort Dodge by Menards but she did not recognize any of them as the hotel she was at when being photographed. As we were driving back towards the Law Enforcement center she pointed out the Economy Inn located at 3003 5th Avenue South, which we then drove into the parking lot and she stated that yes this was the motel. I drove her by the rooms and she pointed out 3 different rooms as possible rooms she went into but was not completely sure because she believed she may have been in the same room for two of the meetings. The room numbers she pointed out were 21, 22, and 24. [D.]

told me that before school started in August, her mother and her moved out of [N.'s] apartment and moved into an apartment in Huxley, Iowa.

In the process of investigating the allegations that [D.] had made I found that the telephone number she gave me that she said belonged to a Mike or Humboldt belonged to a Michael J Malcom from Humboldt, Iowa. Upon checking the Iowa Drivers license records I found that Michael J Malcom had a valid Iowa Drivers License, had a date of birth of [1956], was 6'0", 245 lbs. and listed his address as 8 Maplewood, Humboldt, Iowa. I then checked for any vehicles that were registered to Mr. Malcom and found that he had 4 vehicles total registered to him. One vehicle was a white 2001 GMC Sierra 2500 pickup that was registered both to Mr. Malcom and to a company by the name of Humboldt Ag Services located at 2237 220th Street in Humboldt, Iowa. There was also a Red 2005 Ford F-150 pickup also registered to Mr. Malcom and Humboldt Ag Services. There were lastly two vehicles registered to Mr. Malcom and a Diane Malcom, a 2006 Maroon Chevy Impala, and a 1999 Grey Pontiac Grand Prix. I also at that time requested a copy of Mr. Malcom's driver's license photograph which was placed in a photo lineup. I also completed a property check of both properties through the Humboldt County Assessor and found that the property located at 8 Maplewood in Humboldt showed the deed belonging [to] Michael J and Diane B Malcom. The property located at 2237 220th Street in Humboldt, Iowa showed the deed belonging [to] Michael J Malcom.

I then checked the drivers license record of [N.] and found that [N.] did have a suspended drivers license in the state of Iowa and listed an address of [redacted] in Fort Dodge, Iowa. I also checked for vehicles registered to [N.] and found one vehicle a silver 2006 Chevrolet Impala with Iowa license plate [redacted] and VIN #[redacted] that was registered to [N.] and [redacted].

On 09-16-2010 I met with both Paula [Redacted] and [D.] at the Webster County Law Enforcement Center. I again spoke with Paula [Redacted] outside the presence of her daughter and asked her if she thinks she would remember the adult male that she saw outside her apartment in the white truck. She stated she believed that she would. I then showed her the photo lineup that was created and contained Michael Malcom's drivers license photo in position #4. Paula [Redacted] identified Michael Malcom's photo as the male she saw in the white truck outside her apartment. I also

met with [D.] outside the presence of her mother and also asked if she believed she would be able to remember the older male who photographed her if she saw him again. She stated that she would. I then showed her the photo lineup that had been created and contained Michael Malcom's drivers license photo in position #4. [D.] identified Michael Malcom's photo as the male she met at the hotel and took photographs and video of her.

On 09-17-2010 I drove to the residence located at [redacted] in Fort Dodge, Iowa and did see parked behind the residence a silver 2006 Chevrolet Impala that had Iowa license plate [redacted] that I know is registered to [N.]

It is this officer's belief based on the information obtained in this investigation that there is probable cause to believe there may be items or evidence at or contained in the locations listed above that may be beneficial to this investigation. Based upon my knowledge, training, and experience, and the experience of other law enforcement personnel, your Affiant knows that searches and seizures of evidence from computers and digital media containers commonly require law enforcement officers to seize most or all computer items (hardware, software, and instructions) to environment.

Def.'s Ex. A at 5-7 (internal citations to attachments omitted).

At the suppression hearing, the government called three witnesses. Detective Bahr testified that during the search of the defendant's home, officers found a satchel in the attic bearing a "Pioneer" logo. Officers found a digital camera, pornographic photographs, and electronic storage media, including an SD Pro card, in the satchel. A file on the SD Pro card contained a a video of "D," one of the minors mentioned in the search warrant affidavit, having oral sex and sex with a male subject. No equipment was found at the home that would have permitted the viewing of the video. Bahr testified that the defendant's business, Humbolt Ag Services, had a connection with Pioneer.

Agent Larry Hedlund of the Iowa Department of Criminal Investigation ("DCI") testified that he met with "D." on September 17, 2010, while the search warrant was being executed. "D." told Hedlund that she had asked the defendant if he was concerned that his wife might find the pictures he was taking. Malcom responded that he was not because

he kept the pictures in his office. Hedlund testified that he did not recall specifically sharing this information with the officers involved in executing the search warrant, but his normal practice would have been to do so.

DCI Special Agent Matt Anderson testified that immediately before he assisted in the execution of the search warrant at Humboldt Ag Supply, he received information from Hedland directing him specifically to search the center desk drawer in the defendant's office because evidence of contraband would be found in that location.

The government also placed into evidence transcripts of a series of recorded telephone conversations between DCI Special Agent Chris Callaway and the defendant on September 17 and 18, 2010. These conversations took place during and after the execution of the search warrant. Doc. No. 64-3 ("Def.'s Ex. B") at 1-17.

On September 30, 2010, FBI Special Agent Jon Moeller applied for and obtained a federal search warrant authorizing the forensic analysis of the items seized from the defendant's home and business pursuant to Detective Bahr's search warrant. Doc. Nos. 64-4 and 64-5 ("Def.'s Ex. C").

*Discussion*

At the suppression hearing, the defendant's attorney made it clear that he is not arguing that Deputy Bahr's warrant application fails to set out probable cause to believe the defendant was in possession of child pornography. Instead, he is arguing that the warrant application "failed to establish probable cause to issue the warrant" because "there was no nexus between the contraband being sought and the places to be searched." Doc. No. 64 ¶ 3. He argues that this is because "there was no fair probability that contraband or evidence of criminal activity would be found at the Defendant's residence or business." Doc. No. 64 ¶ 8. He further maintains that any statements he made during his recorded telephone interview with Special Agent Callaway should be suppressed as "fruit of the

poisonous tree." Doc. No. 64 ¶¶ 4-5. Finally, he asserts that FBI Special Agent Jon Moeller's affidavit in support of his application for a federal search warrant was based on Deputy Bahr's bare conclusions, and that evidence resulting from the execution of the federal search warrant also should be suppressed. Doc. No. 64 ¶¶ 6-7.

The judicially created exclusionary rule to the Fourth Amendment "forbids the use of improperly obtained evidence at trial." *United States v. Barnum*, 564 F.3d 964, 968-69 (8th Cir. 2009) (quoting *Herring v. United States*, 555 U.S. 135, 139, 129 S. Ct. 695, 699 (2009)). Not every Fourth Amendment violation, however, results in exclusion of the evidence obtained pursuant to a defective search warrant. *United States v. Hamilton*, 591 F.3d 1017, 1027 (8th Cir. 2010) (citing *Herring*, 555 U.S. at 140, 129 S. Ct. at 700). Rather, the exclusionary rule is "designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Herring*, 555 U.S. at 139-40, 129 S. Ct. at 699 (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 620 (1974)). In this regard, the rule applies only where it results in appreciable deterrence, *id.* at 141, 129 S. Ct. at 700, and in applying the rule the court balances the benefits of deterrence against the costs of excluding the evidence. *Hamilton*, 591 F.3d at 1028. The court also assesses the flagrancy of the police misconduct in determining the application of the exclusionary rule, which serves to "deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144, 129 S. Ct. at 702; *see Hamilton*, 591 F.3d at 1029.

"If an affidavit in support of a search warrant sets forth sufficient facts to lead a prudent person to believe that there is a fair probability that contraband or evidence of a crime will be found in a particular place, probable cause to issue the warrant has been established." *United States v. Grant*, 490 F.3d 627, 631 (8th Cir. 2007) (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983); *United States v. Warford*, 439 F.3d 836, 841 (8th Cir. 2006)) (internal quotation marks omitted). "Whether probable

7

cause to issue a search warrant has been established is determined by considering the totality of the circumstances, and resolution of the question by an issuing judge should be paid great deference by reviewing courts." *Id.* at 631-32 (quoting *Gates*, 462 U.S. at 236, 103 S. Ct. at 2331) (internal quotation marks omitted). Accordingly, the court examines the sufficiency of a search warrant affidavit "using a common sense and not a hypertechnical approach." *Id.* at 632 (quoting *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005)) (internal quotation marks omitted). "When reviewing a probable cause finding, the duty of this court is simply to ensure that the judicial officer that authorized the search had a substantial basis for concluding that probable cause existed . . . ." *United States v. Buchanan*, 574 F.3d 554, 561 (8th Cir. 2009) (quoting *Gates*, 462 U.S. at 238-39, 103 S. Ct. at 2332) (internal quotation marks omitted). If the issuing judge had a substantial basis for concluding that a search would uncover evidence of wrongdoing, his determination of probable cause should be upheld. *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (citing *Gates*, 462 U.S. at 236, 103 S. Ct. at 2331).

Thus, the scope of this court's review of the search warrant in this case is limited to a determination of whether the magistrate had a "substantial basis" to conclude a search would uncover evidence of wrongdoing. In conducting this review, the court is mindful that "affidavits are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *Gates*, 462 U.S. at 235, 103 S. Ct. at 2330 (internal quotation marks omitted). "[M]any warrants are . . . issued on the basis of nontechnical, common-sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." *Id.* at 235-36, 103 S. Ct. at 2331. The task of the issuing judge is simply "to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of

8

persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238, 103 S. Ct. at 2332.

Notably, even if, in hindsight, the information in the affidavit is deemed insufficient to support a finding of probable cause to issue the warrant, the evidence will not be suppressed if the officers acted in reasonable, good faith reliance on a search warrant issued by a neutral and detached magistrate. *United States v. Leon*, 468 U.S. 897, 922-23, 104 S. Ct. 3405, 3420, 82 L. Ed. 2d 677 (1984); *accord United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004). "Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, . . . and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Leon*, 468 U.S. at 922-23, 104 S. Ct. at 3420 (citations and footnote omitted). As the United States Supreme Court noted in *Leon*:

> It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination. Nothing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a "bare bones" affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search.

*Id.* at 923 n.24, 104 S. Ct. at 3420 n.24 (citations omitted).

"Under *Leon*, 'the Fourth Amendment exclusionary rule is not to be applied to exclude the use of evidence obtained by officers acting in reasonable reliance on a detached and neutral magistrate judge's determination of probable cause in the issuance of a search warrant that is ultimately found to be invalid.'" *United States v. Pruett*, 501 F.3d 976, 979 (8th Cir. 2007) (quoting *United States v. Hessman*, 369 F.3d 1016, 1020 (8th Cir. 2004)), *vacated on other grounds*, 552 U.S. 1241, 128 S. Ct. 1473, 170 L. Ed. 2d 294

(2008). If the good-faith exception to the exclusionary rule applies, then it is not necessary for the court to engage in a probable cause analysis. *Id.* (citing *United States v. Rodriguez*, 484 F.3d 1006, 1011 (8th Cir. 2007)).

The *Pruett* court explained the good-faith exception, and the circumstances under which it does not apply, as follows:

> Thus, evidence seized in carrying out a search warrant should not be suppressed on account of an absence of probable cause when an officer's reliance on the warrant is objectively reasonable. *Hessman*, 369 F.3d at 1020. The *Leon* exception does not apply, however, in four circumstances: (1) when "the issuing magistrate wholly abandoned his judicial role," (2) when the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable,'" (3) when the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid," and (4) when the issuing magistrate was misled by false information in an affidavit that the affiant knowingly or recklessly included. *Leon*, 468 U.S. at 923, 104 S. Ct. 3405 (citations omitted).

*Pruett*, 501 F.3d at 980.

Thus, if serious deficiencies exist either in the warrant application itself (*e.g.*, where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth," *id.* at 923, 104 S. Ct. at 3421 (citing *Franks v. Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978)), or in the magistrate's probable cause determination, then the *Leon* good-faith exception may not apply. As the *Leon* Court explained:

> Deference to the magistrate, however, is not boundless. It is clear, first, that the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based. Second, the courts must also insist

10

> that the magistrate purport to "perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." A magistrate failing to "manifest that neutrality and detachment demanded of a judicial officer when presented with a warrant application" and who acts instead as "an adjunct law enforcement officer" cannot provide valid authorization for an otherwise unconstitutional search.
>
> Third, reviewing courts will not defer to a warrant based on an affidavit that does not "provide the magistrate with a substantial basis for determining the existence of probable cause." "Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." Even if the warrant application was supported by more than a "bare bones" affidavit, a reviewing court may properly conclude that, notwithstanding the deference that magistrates deserve, the warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances, or because the form of the warrant was improper in some respect.

*Leon*, 468 U.S. at 914-15, 104 S. Ct. at 3416-17 (internal citations omitted). The Court noted that good faith on law enforcement's part in executing a warrant "is not enough," because "[i]f subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." *Id.* at 915 n.13, 104 S. Ct. at 3416 n.13 (citing *Beck v. Ohio*, 379 U.S. 89, 97, 85 S. Ct. 223, 228, 13 L. Ed. 2d 142 (1964), and *Henry v. United States*, 361 U.S. 98, 102, 80 S. Ct. 168, 171, 4 L. Ed. 23 134 (1959)).

The search warrant affidavit contained ample evidence to support the conclusion that Malcom was in possession of child pornography. According to the affidavit, over a three-month period in the summer of 2010, Malcom had taken children to a motel where he had produced child pornography using a digital camera. The defendant does not dispute this

11

conclusion. Instead, he argues that the facts recited in the affidavit were insufficient to lead a prudent person to believe that there was a fair probability that contraband or evidence of the crime would be found in either the defendant's home or business. *See Gates*, 462 U.S. at 238. The defendant's argument raises a serious issue. Although there is strong evidence in the affidavit to show that the defendant had created and was in possession of child pornography, there is little evidence to support a conclusion that Malcom was storing the child pornography either at his home or at his business.

The government argues that facts and inferences in the affidavit created a fair probability that child pornography and other evidence of exploitation of minors could be found in Malcom's home and business. First, pictures depicting child pornography were taken using a digital camera. This means, the government argues, that the defendant would have needed a computer or some similar device to view the photographs. The two most logical places for a person to have a computer would be at his home or place of business. The government further argues that since the defendant paid $1000 for the pictures, they were valuable to him, so logically he would want to keep them someplace where they would be accessible, such his home or business. Finally, the government points out that the defendant told one of his victims that he had a "collection" of these types of images. A "collection" would have to be stored. Again, the government argues that Malcom's home and business were the two most likely places for him to store his collection.

The government's argument borders on a claim that law enforcement would have the authority to search the home and business of anyone they reasonably believe is in possession of child pornography, without any showing of a nexus between those locations and the child pornography. This is close to what the Eighth Circuit Court of Appeals held in *United States v. Summage*, 481 F.3d 1075 (8th Cir. 2007).

In *Summage*, an alleged victim, along with his mother and sister, went to law enforcement to report what they believed to be a crime involving the victim and the defendant. They explained to the police that the victim was a low-functioning, mentally retarded individual who worked at a handicap development center and feared the defendant. The victim told the police that he and the defendant were supposed to go can-collecting, but instead, the defendant took the victim to his apartment. There, the defendant offered the victim compensation if he would have sex with a woman that was waiting naked in the defendant's bedroom. The woman undressed the defendant, had him lie down on the bed, and then performed oral sex on him while the defendant videotaped and took photographs of the encounter. After further investigation, the police learned that the defendant had subsequently moved to a different residence. The police prepared an application for a warrant to search the defendant's new residence. The defendant sought to suppress the evidence seized during the search. The court held as follows:

> We turn next to the question of the nexus between the evidence to be searched for and the place to be searched. *See United States v. Tellez*, 217 F.3d 547, 550 (8th Cir.2000) ("[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue…."). For the same reason set forth above regarding the timeliness of the information,[1] we conclude that the district court erred in finding the lack of such nexus. Judges "may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant…." *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir.2000). Given the circumstances here, we think it would be reasonable to

---

[1] On the question of the timeliness of the information used to support the warrant, the court acknowledged that the affidavit was based on conclusory statements, and that such statements fail to give the issuing magistrate a substantial basis for determining that probable cause exists, but nevertheless held as follows: "[W]e conclude that it could be presumed that Summage would maintain in his possession the video and photographs that he made of the sexual encounter between [the victim] and the waiting woman. Thus, the affidavit's failure to include the date of that encounter is not fatal to a determination that probable cause existed for a search of Summage's new residence." *Summage*, 481 F.3d at 1077-78.

> infer that Summage would have the video and photographs at his new residence.

*Summage*, 481 F.3d at 1078.

Malcom argues that *Summage* can be "easily distinguished" (Doc. No. 75, p. 2) from the present case because in *Summage* the defendant videotaped and photographed the sex act in his first residence and there was evidence that he was storing video recordings at his first residence, so it logically followed that if he moved, he likely would store the materials in his new residence. This argument is based on a misreading of *Summage*. There was no evidence that the defendant was storing videotapes or photographs in his first residence other than the conclusory statement in the affidavit that "[i]t is believed that Summage is currently in possession of these items." *Id*. at 1077. The only basis for finding a nexus between the items sought in the search warrant and the defendant's residence was the conclusion by the appeals court that "it would be reasonable to infer that Summage would have the video and photographs at his new residence." *Id*. at 1078. The same reasoning applies to the searches of Malcom's residence and business. *Summage* is controlling precedent on the issue presented to the court in the present case.

Even if the warrant affidavit failed to establish a sufficient nexus between the items sought in the warrant and Malcom's residence or business, *Leon* would preclude suppression of any evidence seized pursuant to the warrant. In light of *Summage*, it cannot be said that an officer executing the warrant would have had "have no reasonable grounds for believing that the warrant was properly issued," or that the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923, 104 S. Ct. at 3420-21.

Because the items seized pursuant to the state warrant should not be suppressed, the motion to suppress also should be denied as to the defendant's recorded statements and the evidence resulting from the federal warrant.

*Recommendation*

For the reasons stated above, IT IS RESPECTFULLY RECOMMENDED that that the defendant's motion to suppress (Doc. No. 64) be **denied**.  Objections to this Report and Recommendation must be filed by **May 21, 2012**.  Responses to objections must be filed by **May 25, 2012**.

IMPORTANT NOTE:  Any party planning to lodge an objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **May 16, 2012, <u>regardless of whether the party believes a transcript is necessary to argue the objection</u>**.  If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 14th day of May, 2012.

*[signature]*

PAUL A. ZOSS
CHIEF MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT